*Commissioner of the Department of Disabilities, Aging, and Independent Living v. Homestead at Pillsbury*, 618-11-18 Wncv
(Teachout, J., Jan. 25, 2019)
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

# STATE OF VERMONT

**SUPERIOR COURT**                                   **CIVIL DIVISION**
**Washington Unit**                                   **Docket No. 618-11-18 Wncv**

**Commissioner of the Department of Disabilities,
Aging, and Independent Living**
    **Plaintiff**

    **v.**

**Homestead at Pillsbury, Pillsbury Manor–South,
and Allenwood at Pillsbury Manor**
    **Defendants**

### DECISION ON APPOINTMENT OF RECEIVER

The State seeks the appointment of a receiver for three licensed residential care facilities and an entity involved in operating them. A Temporary Receiver was appointed on November 7, 2018 on an *ex parte* basis. A hearing on the merits was commenced on November 14 and continued on December 10–12 and January 8–11 and 14–18.

The State is represented by Assistant Attorneys General Bessie Weiss, Kirstin L. Clouser, and Linda A. Purdy. The Defendants are represented by Attorneys Lisa B. Shelkrot and Peter F. Langrock.

Upon appointment, the Temporary Receiver, Douglas J. Wolinsky, became a party and is represented by Attorneys Shireen T. Hart and Gary F. Karnedy. The lender is an Interested Party and is represented by Attorneys Christopher J. Nordle, Robert C. Roesler, and E. Darby Herrington.

### Findings of Fact

Based on the credible evidence, the court makes the following findings of fact. There was conflicting evidence on many points, particularly on the reasons that certain events happened. The findings below do not include all conflicting explanations on all points, but focuses on the facts that the Court finds based on credible evidence. These facts are found based on the standard of clear and convincing evidence.

The facilities collectively serve over 200 residents. They are:

<u>Homestead</u> at Pillsbury, located in St. Albans
It has 56 units that are fully licensed for residential care but has a mix of residential care and independent living residents at this time.

<u>Manor South</u> at Pillsbury, located in South Burlington
It has 70 units and is fully a residential care facility.

<u>Allenwood</u> at Pillsbury Manor, located in South Burlington
It is the largest facility. Allenwood itself has a mix of residential care (30 units) and independent living residents. In an adjacent separate building is a fourth facility called Harborview, which has units for independent living only and, although it has no units licensed for residential care, it is owned and managed together with Allenwood. There are 128 units between Allenwood and Harborview.

Residential care unit residents are provided three meals a day plus services related to their care plan such as medication administration and assistance with activities of daily living such as bathing, dressing, and incontinence management, as well as monitoring for falls and other events that occur in a vulnerable population. Some qualify for and have long term care insurance.

The facilities were operated for many years by the Larkin family. In May of 2017 they were sold. The new ownership and management structure is complex. Many different LLCs for different purposes (at least 4 for ownership, 4 for leasing, 4 for management, and other related ones) provide various services through a network of contractual arrangements. A separate LLC provides employees under a service agreement. Yet another one provides bookkeeping operational services under a service agreement. All are under the management of Andrew White, who is 90% owner of many of the LLCs and also owner of a parent company, East Lake Capital Management LLC. The parent company run by Andrew White has also acquired numerous senior living facilities nationwide. Mr. White and the corporate office are located in Dallas, Texas.

As part of the acquisition, Mr. White applied for, and received Level III residential care licenses from the State of Vermont for the three facilities in the name of the LLCs that manage the facilities:

ELCM Homestead Management LLC,
ELCM Manor South Management LLC,
ELCM Allenwood Management LLC.

An umbrella management LLC, ELCM Pillsbury Management LLC, was also identified in each of the license applications as an entity with "direct ownership or controlling interest in the business." These four entities are the Defendants in the original complaint. Mr. White is the manager of each of these LLCs. Attorney Shireen Hart prepared the license applications in 2017 on behalf of Mr. White and the entities.

2

The purchase was financed with a loan in the original amount of $24 million secured by the real estate on which the facilities are located as well as an unsecured note to a Larkin family entity. Original loan documents for the commercial loan included a Loan Agreement and Cash Management Agreement, which defines the three licensed Management LLCs collectively as "Manager" and was signed by Mr. White on their behalf. It required rents to be deposited into a lock box account, out of which mortgage payments, escrow payments, and other specified required payments are to be made before the remaining funds are available to be used for operating expenses.

At the local Vermont level, residents' checks for rent and other services were deposited in a corporate-based Wells Fargo account by the Vermont Portfolio Account Manager, who also sent all bills and related documents weekly to Dallas for payment. There was no local bank account upon which checks could be written. There was initially a corporate credit card for use for incidentals by local management staff.

From May of 2017 to February of 2018, the system functioned appropriately and all facilities ran smoothly.

In February of 2018, the Wells Fargo account was frozen and the Portfolio Account Manager was no longer able to deposit residents' rent checks. The corporate credit card was no longer usable, so local staff no longer had access to funds for incidentals. Mr. White told staff that it was the result of a banking problem that would be resolved shortly, and he told the Account Manager to keep resident checks locked in a desk drawer. Mr. White attempted to explain the "banking problem" in testimony at the hearing, but the explanation did not make sense in relation to the evidence of what occurred in ensuing months. It is unclear what brought this situation about.

Invoices for residents were generated by "corporate" in Dallas. In February, invoices were prepared for March, but this was the last month for which invoices were sent to residents. The Admission Agreement for residential care residents requires bills to be "sent out for rent and miscellaneous charges."[1] Vermont regulations require licensees to comply with the terms of the Admission Agreement. From March until late December, after the Temporary Receiver was appointed, residents received no bills and had no ability to check on their financial accounts with the facilities, and while some continued to submit rent checks anyway, all those checks were placed in a locked drawer in a desk pursuant to Mr. White's instructions. Some became stale during that 10-month period.

Beginning in March, residents began to be upset and angry that their rent checks were not being cashed, and that they were not receiving invoices. Some with long-term care insurance worried that their insurance would not pay if there was no invoice. Some

---

[1] Exhibit KK, Admission Agreements for the three licensed facilities. The Admission Agreement for independent living apartments at Harborview does not require a bill. Exhibit V.

had difficulty sleeping, and some began to worry about whether they would continue to have a place to live if the owner was not taking in rent.

On March 19th, Green Mountain Power sent a shut-off notice that electricity would be shut off if the bill was not paid. Liza Rixon, the manager (top local staff) at Manor South and Allenwood, paid the bill with her personal credit card to prevent shutoff. The Comcast bill was overdue, and Comcast service was disconnected for one day. Comcast is needed for phone service, cable and internet, and for operation of the medical records program where residents' medical records are kept. At Homestead, the manager Sarah Holm began using her personal credit card for purchases of personal items for residents that had to be ordered online. These included items such as compression socks needed to control blood pressure and specialized products related to incontinence.

The major vendor for food at all facilities was Reinhart, a national company that had been filling food orders and making deliveries at the facilities at least twice a week, with payment every Friday. Payment terms were 30 days, but prior to February, a discount was given for payment within 7 days and this had been utilized.

In April, a Reinhart bill was not paid on time, and its bills thereafter began to be overdue. Shadowcross was a local company that had provided milk, cheese, and eggs over a long period of time. Its bill was overdue. After calls to Dallas, the bill was paid by Mr. White's wife with her personal credit card. The facilities had 4 vehicles, including a wheelchair van for transporting residents to medical appointments and an activities van as well as a car and a snow plow truck. In order to have fuel for the vans, the Account Manager paid for gas with his personal credit card.

The anxiety on the part of residents was growing. They were receiving no bills and their checks were not cashed, leaving them and their families uncertain about their own bank accounts and the ability of the facility to continue to function without rental income. Staff was under the stress of needing to meet the needs of the residents with their own personal credit (at least upfront, even if they were reimbursed later). They also knew that resident income was not being deposited and bills were not being paid and that the residents were anxious. In addition, residents and their families could see that there were fewer nurses at Allenwood than there had been previously. There had begun to be staff resignations related to nursing, dining, and maintenance.

The situation continued in May. The overdue bill for Vermont Gas was more than the Account Manager could pay with his own credit card. Liza Rixon resigned at the end of May as Executive Director of both Allenwood and Manor South, leaving no manager for those three buildings, including two licensed facilities. On May 31st, Green Mountain Power sent a notice that electricity would be shut off at the three buildings on June 18th. The unrest among both residents and staff continued. While vendor bills were not being paid on time, payroll was maintained from corporate so staff was paid.

At the hearing, Mr. White testified that there was no problem with money. He pointed out that payroll was always made on time and stated that the parent company had

4

plenty of money it was providing, although there is no reliable evidence of the terms on which this occurred. Payroll was met and bills were getting paid, albeit late, from some source. Mr. White testified that the parent company was paying on behalf of the facilities in exchange for the uncashed checks in the drawer, but there is no documentation that this was recognized in the accounting of the organizations as a valid transaction. In prior years, including 2017, there had been budgets. There were no budgets in 2018.

Mr. White explained that during this period he was working to try to get all vendors on a routine payment schedule that was efficient for the corporate check run schedule in Dallas, which is that payments would be made 30 days after a service had been approved by corporate. He explained the situation as if the problem were just transition hiccups inherent in a change of management. It may be possible to make special contractual arrangements with some vendors, but it is not realistic that all utilities providing such essential services as electricity, water and sewer, heating fuel, telephone and internet service would or should adjust their payment terms to match the specifications desired by East Lake corporate. Moreover, the explanation does not sufficiently explain why bills were overdue even after 30 days.

Even if money was available from the parent company, the management pattern developing was not paying bills on time, not responding to the pleas of local staff to pay to avoid shutoff, not providing a corporate credit card or local checking account to pay for incidentals, relying on staff to use their personal credit to ensure continuation of services or meet resident needs, and not explaining any of this to anxious staff and residents while rent checks were either not solicited or sat aging in a desk drawer. This, together with the departure of Liza Rixon, contributed to a growing sense of instability.

Beginning in June, there was no one in charge at Manor South and Allenwood in place of Liza Rixon. The Portfolio Account Manager was offered the job but declined it. Communication with "corporate" was poor. When the Portfolio Account Manager called corporate, he got a message that calls were not being accepted. The Reinhart bill began to be unpaid periodically on Fridays, meaning that the kitchen could not get deliveries the following Wednesday and had to make adjustments. Menus are required to be posted for a week in advance, and residents count on the posted choices. At some point in June, the municipal water and sewer bill was over $4,000 and was overdue by 60 days. A late fee was charged.

DAIL, the Department of Aging and Independent Living, conducted a regulatory survey in June at Manor South and Allenwood. It found staff shortages in both facilities. On at least one occasion, where formerly there had been 3 nurses working at one time, only one nurse was available to cover all three buildings. It also found that residents had been due refunds that were unpaid (when residents die or leave, they or their families are entitled to a refund of unused amounts within 15 days). These constituted deficiencies, and the facility was required to do a Plan of Corrections. In connection with the unpaid refund situation, the Portfolio Account Manager needed to include a solution in the Plan of Corrections. When he reached Mr. White, Mr. White told him that the checks were sent, so he wrote that in the Plan of Corrections. It later turned out that was not true.

5

Mr. White announced that he was coming to Vermont on June 14 and 15. He wanted to meet first with Kellen Brumsted, the Portfolio Account Manager who was located at the South Burlington campus and had been fielding management problems there since Liza Rixon left, although without authority, and Sarah Holm, the Manager at Homestead in St. Albans. Mr. White had spoken on the phone to Mr. Brumsted about becoming Executive Director of the South Burlington facilities and/or Co-Executive Director with Sarah Holm. Mr. Brumsted had declined, though he said he would do what was needed to be done until the position was filled. Sarah Holm had declined to assume responsibilities at the South Burlington facilities and wished to be responsible only in St. Albans.

Mr. White was scheduled to meet with the two of them from 8:00 to 10:00 at Allenwood, to be followed by a meeting with the managers at South Burlington at 10:00 and a meeting with residents and families at 11:00, and then he would have comparable meetings the next day, June 15, at Homestead in St. Albans with managers and residents and their families.

The staff and residents who testified stated that they understood the purpose of the meeting was for Mr. White to speak directly to everyone to explain the problem with billing and payments and describe what was going to be done about it. Mr. White testified that the purpose of the meeting was to announce that Kellen Brumsted and Sarah Holm would be Co-Executive Directors, even though neither had accepted the position.

Mr. White arrived at 9:47 and only had time for 10 minutes with Kellen Brumsted and Sarah Holm and nothing was resolved. He told the staff managers that the problem of collection of rents would be resolved soon. He told residents and families that it would be resolved by July 1st, or August 1st at the latest. He also announced that Kellen Brumsted and Sarah Holm would be Co-Executive Directors, even though neither had accepted the position. Sarah Holm was surprised to be congratulated by a resident.

Mr. White promised staff and residents that within a few days they would receive a written communication from him with minutes, an explanation of the problem and a plan to resolve it. His meetings the next day were comparable. At the end of the day, he asked Mr. Brumsted to forward to him minutes that were taken of the meetings in preparation for the written follow-up.

While Mr. White was in Vermont, a subject discussed was the inability to pay for incidentals and to pay people such as performers at the musical events held at the facilities, or gas for the vans, or other incidentals. Mr. White gave Mr. Brumsted $4,000 to use for petty cash. Mr. White claims that he gave Mr. Brumsted $10,000 and believes that Mr. Brumsted cannot account for the balance. Mr. Brumsted's testimony was clear that it was 40 $100-bills, and that he counted it and cross-checked it with a staff coworker and maintained it at the facility with a cash ledger with receipts to account for the money. Half of it went to Homestead, so each location had $2,000. A colleague of Mr. White's from Dallas saw Mr. White give Mr. Brumsted an envelope with cash but does not know

6

how much it was.  What is clear is that there was $2,000 for petty cash at each location that was maintained as a petty cash supply of money for incidentals and that ledgers were kept.

Mr. White returned to Dallas with nothing resolved about the directorship positions and the positions and responsibilities of either Mr. Brumsted or Ms. Holm.  Mr. Brumsted kept sending daily updates about delinquent bills.  Fortunately, the Green Mountain Power shutoff date of June 18th passed without shutoff.  On June 20th, Mr. White's wife paid the bill with her personal credit card.

On June 18th, the lender sent notice to Mr. White that the lock boxes called for under the Cash Management account had been closed due to inactivity, and that this constituted a default under the Cash Management Agreement.  He did not respond.

On June 25th, Mr. Brumsted and Ms. Holm had a conference call with Mr. White. He said that the communication to staff and residents would be forthcoming.  Nothing was ever sent to staff or residents.  He also stated that a recruiter would be coming to Vermont to help with recruiting.  Throughout June and July, it was apparent to residents and families at Allenwood that nurses were working long hours or double shifts.  No recruiter ever came.  Mr. Brumsted sent spreadsheets with invoices to Mr. White, his wife, and Ben Lord in Dallas.

Ms. Holm tried to contact Mr. White for a job offer letter for the job he was presumably offering her.  She also tried to contact him about paying the hairdresser at Homestead, who had been unpaid for some time.  Regular weekly hair dressing appointments are an important part of routine life for many residents, and she wanted to maintain the service for the well-being of the residents.

On July 2–3, DAIL did a survey at Manor South for both relicensing purposes and because of complaints received.  When the surveyor arrived, no one could tell her who the manager was.  Ms. Holm from Homestead was asked to help, which she did.  The surveyor got Mr. White on the telephone to discuss the problem of the bills.  Mr. White said the problem would be fixed, and he would come back in July.  This was cited as a deficiency.  There were also two refunds due residents that had not been paid.  The surveyor also found deficiencies relating to the quality of resident care: there had been insufficient supervision of a person changing an oxygen tank, a failure to monitor side effects of antipsychotic medication, insufficient staff training, and a failure to conduct background checks.

On July 3rd, the servicer of the mortgage loan faxed a notice to Mr. White seeking compliance with the lockbox requirement.  The letter was sent prior to acceleration of the loan and default based on failure to maintain the lockbox and provided 30 days to cure. Mr. White did not respond.

During the second week in July, Mr. Brumsted notified Mr. White that he had again had to use his personal credit card for facility expenses.  Mr. White said he would

7

wire money to Mr. Brumsted's personal account.  He wired $1,800 to Mr. Brumsted's personal account for use at Allenwood and Manor South, which Mr. Brumsted cashed and used to pay for gas and performers at facility activities, and $1,545 for petty cash for Homestead, which Mr. Brumsted drove to St. Albans.

On July 16th, Mr. White sent Mr. Brumsted an offer letter to be Co-Executive Director with Ms. Holm of the South Burlington facilities, even though Ms. Holm had declined to be a "Co."  This was one and one-half months after Liza Rixon had left, and a month after the June trip to Vermont.  In the meantime, there had been no Executive Director in South Burlington.  Mr. Brumsted responded with questions, including some asking about the bonus component of the offer and how it could be calculated given that there were no budgets.  Mr. White appears to have taken offense at his response, and he testified that they had a "salty" conversation soon after the email and that their relationship deteriorated after that.

Also in July, the long-time hairdresser at Homestead left due to not having been paid for 6 weeks.  Staff left at all levels.  Mr. Brumsted and Ms. Holm tried to fill the positions, but staffing was short.  By this time, Mr. White's June promise to send a communication and resolve billing in July had not been kept, and residents were becoming increasingly anxious about what was going to happen.  Ms. Holm received a job offer letter and emailed Mr. White that she wanted to discuss it.  He responded that she should call him.  She did and left a voicemail but got no call back.  She also emailed him and got no response.

Rosemarie Provetto was hired to work at Allenwood and Manor South in July.  The evidence is confusing as to what her role was.  She was apparently hired as Director of Nursing but may have also taken on the additional responsibilities of the sort an Executive Director might do, although without specific authorization.  There was no Executive Director.  She discovered that the wheelchair van was inoperable and could not be used to transport residents to appointments, and that staff was using the other van for that purpose in an unsafe way.  She emailed Mr. White two or three times to try to get the wheelchair van repaired and got no response.

Reinhart started cutting off food orders at Homestead due to nonpayment of the bill, resulting in time being spent trying to contact corporate to get the bill paid.  As of July 18th, there were overdue bills to Shadowcross at all 3 facilities.  Homestead received a disconnect notice for nonpayment of the gas bill.

As of July 31st, Barbara Moynan became the Manager at Allenwood.  She faced serious shortages in the nursing staff, and contacted Mr. White seeking permission to contact agencies or traveling nurse services to address the shortage.  Mr. White did not allow her to seek nurses from those sources.

The situation did not improve in August.  About 50% of the time, the Reinhart food bill was not paid on Fridays, resulting in an inability to place food orders on Wednesday to provide food for the remainder of the week and weekend.  Many

8

emergency calls and emails had to be made to corporate to get the payment wired by 2:00 pm so that food could be ordered. The dining room manager at Homestead had to change the menus from the posted menus and had to go to local stores to get food. The nursing shortage at Allenwood continued. Mr. Brumsted and Ms. Holm prepared proposals to use traveling nurse agencies to increase staff, but these were not approved.

At some point in August, with no prospect of an Executive Director for South Burlington on the horizon, Mr. Brumsted, who had been filling the void for over two months, decided to sign the offer letter and accept the position and take advantage of the increase in salary, even though he had not received satisfactory responses to his questions about the offer letter.

DAIL did another survey in August at Allenwood, and the surveyor found many deficiencies:

•refunds to residents were still unpaid, despite the prior report that they had been;
•staffing was inadequate: on July 5th, only one medical technician and no nurse was on duty;
•medications, including time-sensitive anti-stroke and anti-seizure medications, were not being administered on time; and
•a hospice resident's bowels were not being monitored, resulting in risk of pain.

The surveyor tried to work with and help local managers but could not get a response from Mr. White.

Mr. Brumsted emailed Mr. White about the nonpayment of resident refunds on August 15th. Mr. White said that checks had been sent and he would call the next day. On August 16th, Mr. Brumsted said that he needed an answer and proof that the refund checks had been sent, as the DAIL surveyor was in the building and needed a response the following day. Mr. White talked about a new vice president he was thinking of hiring, and never sent proof of sending the refund checks.

Although as of August 17th the payments on the mortgage loan were up to date, on August 21st, the loan servicer sent a notice of default to Mr. White, identifying that the default described in July (compliance with the Cash Management Agreement) had not been cured, and that the loan was under review for transfer to a special servicer. Mr. White did not respond. On August 24th, servicing of the loan was transferred to Rialto, a special servicer whose role was to proceed with enforcement of a loan in default. On August 29th, the Rialto person in charge of the loan emailed Mr. White and invited him to communicate, attaching a "Pre-Negotiation Letter" to the email. Mr. White never made contact.

By late August, the staff shortage at Allenwood was serious. One nurse worked 20 hours of overtime in a week. Ms. Holm had had to make about $5,000 in Homestead-related charges on her personal credit card. Although she was later reimbursed, it took weeks, and affected her credit status.

Mr. Brumsted sent an email to Mr. White on September 4th, resigning and giving 30-days notice and reminding him that he had prearranged to go on two weeks family leave when his child was born, which was due to occur in September.

On September 7th, the Long Term Care Ombudsman for Vermont emailed Mr. White about complaints and concerns. The same day, Pamela Cota, the Chief of the Division of Licensing and Protection, having received numerous complaints, tried contacting Mr. White at the phone number on the license. It is normal for the Division to reach out informally to try to help licensees correct problems and come into compliance with State regulations. She did not get a response and tried calling again on September 10th without success. On September 17th, she emailed Mr. White and Mr. Lord regarding Allenwood and Manor South and received no response.

On September 16th, Mr. Brumsted's daughter was born and he went out on family leave for two weeks. This would be the majority of his remaining time as an employee. Thus, South Burlington was again without anyone in the Executive Director position.

A DAIL survey was done at Homestead on September 18th. The surveyor found deficiencies, including:

•resident refund unpaid within 15 days;
•a narcotic theft had not been reported as required by regulations; and
•no background check had been done on a new employee.

Ms. Holm tried to contact corporate 6–8 times by phone and email regarding these deficiencies. Mr. Lord responded that a check had been cut to the family. The amount was later discovered to be short. In the meantime, residents at Homestead were asking daily why they had not yet been billed.

There was still no invoicing to residents and all checks since February—seven months prior—were uncashed. It was 6 weeks after the latest date that a solution had been promised. Residents had received no communication and had good reason to wonder whether the facilities would be able to continue in operation.

On September 25th, Rosemarie Provetto apparently became Acting Executive Director of Manor South, Allenwood, and Harborview. She tried emailing Mr. White and got no response. When she tried calling, she got a message that she was not authorized to call his number.

Shadowcross stopped doing business with the Pillsbury facilities. While dairy products and eggs could then be purchased at Reinhart, it was more expensive. Reinhart food deliveries started regularly being stopped for lack of payment.

There was no improvement in staff shortages. Caregivers, instead of nurses, were responding to emergencies. Because of the shortage, response times were longer. At one

10

point, one nurse had two simultaneous emergencies to which she or he needed to respond. Existing staff nurses were working significant overtime and were exhausted, and this was clearly observable by the residents. Timely checking on residents vulnerable to falls did not occur. At Manor South, the 24-year old dishwasher that sanitizes all kitchen items was breaking down and in need of repair or replacement.

Sometime in September, the corporate human resources director in Dallas had posted openings for two positions: Executive Director of the South Burlington facilities, and a Regional Director of Operations for facilities in other states as well as Vermont. The interview process for these positions began at corporate in Dallas with telephone interviews.

On October 1–3, DAIL conducted another survey at Allenwood and Manor South. The following deficiencies were identified:

•no invoices (repeat from August);
•inadequate staffing (repeat from August);
•resident care plan problems: not up to date with current condition; insufficient documentation; failure to monitor symptoms and notify a doctor; failure to address incontinence;
•insufficient food supply;
•vendors not being paid; petty cash used to buy food; and
•refund unpaid from February.

At Allenwood, a familiar charge nurse had left. This and other nursing staff changes were upsetting to residents. Nurses were exhausted from overtime work and working on a schedule that was unsustainable for them and for the wellbeing of the residents. There was a tremendous level of anxiety among the residents. They were concerned that they may not be able to remain there as their home and would have to find another place to live.

Staff at Allenwood emailed Mr. White and Mr. Lord about responding to the deficiencies cited and received no reply. Vendor invoices were not being paid. At Allenwood and Manor South, Barbara Moynan and Rosemarie Provetto were emailing Mr. White about the inability to order food. Staff had spent $400 of their own money to buy eggs and milk. Petty cash had run out and staff were using their own money for gas and patient needs.

On October 2nd, Pam Cota, the Licensing Chief, was concerned about the food shortages. She called Ms. Holm and asked her to have Mr. White call 'today.' He called, and they set up a call for the next day.[2]

---

[2] Ms. Holm was actually only the Manager at Homestead in St. Albans, having declined the offer to become Executive Director in South Burlington. She was a responsible and effective person, however, and wound up being treated by Mr. White as if she were the Executive Director for South Burlington as well. She was clearly seen by Ms. Cota as a

A conference call took place on October 3rd between Ms. Cota and others from the State and Mr. White. Ms. Cota had a list of concerns and questions that she wanted to review with Mr. White. Not having received adequate responses during the call, she sent a follow-up email the next day listing the questions, and adding two more: one about ownership of the real estate and the other about an effective telephone number. She asked for a response by October 8th. There was no response by October 8th.

On October 9th, Mr. White emailed that he would respond by close of business on October 10th, and that he wanted to have a call. On October 11th he stated that he had approved responses to be sent. Ms. Cota then set up either a conference call or in-person meeting (as she understood Mr. White might be coming to Vermont) for October 15th.

On October 12th, the Department issued a ban on new admissions at Manor South based on the failure to correct the deficiency from July concerning failure to pay resident refunds. This is an unusual step. Residents from Manor South frequently leave due to a need for a different level of care or death, and a ban on new admissions results in a decline in the population and decreased income until the regulatory compliance problem is resolved.

On October 15th, the scheduled conference call between the Department and Mr. White was scheduled to start at 1:00 pm. He did not call in, so Ms. Cota called him. He then called in and did not address the questions and concerns. He was angry and frustrated and was hard to follow but was apparently accusing the Vermont officials of targeting him because of actions going on in some other state. He hung up, but emailed Ms. Cota that she could call back. She did.

The conversation that ensued was unsatisfactory to both sides as an attempt to communicate and bring about progress through informal communication. Mr. White accurately stated that he did not have an obligation to talk and apparently did not wish to, and Ms. Cota agreed to "decouple" informal resolution attempts from regulatory enforcement and stated that she would be proceeding with the formal regulatory process. Although the survey reports with deficiencies and the October 12th ban on admissions had previously been sent to the facility addresses according to regular procedure, Ms. Cota agreed to send copies directly to Mr. White in Dallas, and she did. On October 16th she emailed him that she would be happy to discuss the situation further. He never contacted her again.

The next day, October 17th, the attorney retained by the lender's special servicer, Rialto, sent Mr. White a formal Notice of Default and Acceleration of Loan. This meant that the entire loan balance plus all interest, fees, and other charges was being called by the mortgage holder as immediately due and payable. The amount claimed is over $24 million. There is no evidence that either Mr. White or anyone in Dallas ever informed

responsible person through whom Ms. Cota might be able to establish contact with Mr. White.

12

either the State or any managers or staff in Vermont about the actions previously taken by the mortgage holder or of this Notice of Default and Acceleration.

Meanwhile, on October 21st, Barbara Moynan emailed Chelsea Balestra, the HR person at corporate in Dallas, asking who she should talk to in order to respond to the State concerning the deficiencies from the survey. Ms. Balestra, Ben Lord, and Sarah Moreau are the people with whom the Vermont managers had contact. Mr. Lord is on the acquisition team of East Lake for new facilities, and Sarah Moreau's role is unclear but she was Mr. White's wife, and was no longer involved after June. In all contacts from Vermont staff to these corporate personnel, they deferred to Mr. White for decisions. Ms. Balestra responded with an email to the effect of "I believe they have a plan," apparently referring to Mr. White and Mr. Lord. Ms. Moynan never received a plan.

By October 22nd, the problem of concerns on the part of State regulators had risen to the level of being dealt with by Monica Hutt, the Commissioner of DAIL. Assistant Attorney General Bessie Weiss, the attorney for the Department, sent an email and certified letter to Mr. White in Dallas on behalf of the Commissioner seeking a response to a specific list of questions by October 29th.

As of the end of October, Homestead had gone one week without delivery of food and was using emergency food, despite calls and emails to Mr. White. The trash hauler had stopped picking up trash at Homestead and after the trash accumulated to the point of creating a messy overflow at risk of attracting animals, Ms. Holm drove the trash to the dump herself and paid for its disposal. The trash hauler had also stopped picking up trash at Allenwood and the dumpsters were overflowing, including with trash from incontinent residents.

At Allenwood and Manor South, in the period Nov 1–3, the dining manager had been unable to order food for 5–6 days in a row. He had reduced the food served from 3 entrée choices to 2. He had had to change the menus from the previously posted menus, upsetting residents. He had begun to run out of food and considered the situation dire. Although State regulations do not require a specified amount or type of food or a specific length of time for which food reserves are required, they do require that there be an adequate advance supply to meet upcoming weekly menus and that the food varieties served meet all requirements of a well-balanced diet including a balance of protein, vitamins, fresh produce, etc.

The dining manager at Homestead had only two days' worth of meat left, and so went to Costco and obtained a personal Costco card and shopped there and at other stores for chicken, ham, turkey, and sources of protein in order to provide healthy, balanced meals, though the menus differed from posted menus. Petty cash was running out, and at least once he used his own money. If he had not done this shopping, residents would have been deprived of nutritious food. One of the chefs gave notice that he was quitting, but the dining manager was able to convince him to stay. If the chef had left, that also would have contributed to a lack of proper food.

Meals at Allenwood had previously been served restaurant-style, with residents seated and served at tables. Due to shortages in staffing, the manner of service had been changed to buffet style, with residents serving themselves from a buffet table and carrying their plates to a table. Residents saw those who were blind or used walkers struggling with trying to see what the choices were and serving themselves and then negotiating themselves to a table while trying to manage both their plates of food and their walkers. The situation contributed further to the distress of residents and the sense of an unstable living environment.

On November 5–7, DAIL again conducted surveys at Allenwood and Manor South, this time based on complaints. On November 5th, the surveyor was shown the Reinhart computer screen that showed that Reinhart was owed a total of over $53,000, of which $12,773 was past due from Allenwood and $7,116 was past due from Manor South. The screen stated "This account is on Stop Ship" and would not permit an order to be placed.

The survey resulted in the following deficiencies identified at Allenwood:

•no invoices (repeat);
•insufficient food supply (repeat);
•inadequate staffing to meet resident needs (repeat);
•vendors unpaid; use of petty cash to meet menus (repeat);
•medication administration irregularities (antiseizure meds given late);
•resident left unattended too long, resulting in a Finding of Mental & Emotional Harm based on Abuse and Neglect;
•insufficient documentation of care; and
•financial records of residents unavailable for resident/family review (repeat).

The survey resulted in the following deficiencies identified at Manor South:

•refund from February death unpaid (repeat);
•no invoices (repeat);
•insufficient food supply:
        •not enough food for weekend;
        •not enough food to meet menus;
        •depleted supply; no order since 10/30;
        •not enough types of food to meet nutritional needs of residents; and
•financial records of residents unavailable for resident/family review.

On November 6th, the Department issued a ban on admissions at Allenwood for repeat violations related to failure to bill residents.

As of November 6th, the Commissioner's information was that food had not been able to be ordered for 5 days at any of the facilities, that emergency food stores had already been used and were being depleted, that there was only a few days of food left and no orders could be placed due to nonpayment of past amounts due. At 1:37 pm she

14

sent Mr. White an email marked "high importance" stating that there was an immediate need for food and calling upon him to pay the bill so food could be ordered and delivered. He claims that he had paid the bill that morning by wire, but there is no documentary evidence of early-day payment. Also, he did not respond to the Commissioner's email, nor did he inform anyone at any of the facilities that the bill was paid and they could proceed to order food. He only sent an email to Ms. Holm, who was on vacation and did not receive it. The timing of that email is unknown.

Rather, there is an email chain between Selma from Allenwood and Mr. Murray from Dallas with confusing times (not adequately explained by the time zone difference) but all of them between 3:04 and 4:30 in the afternoon. Selma sent Mr. Murray information on how to pay the bill. He responded that "I will either have the outstanding balances wired or cut checks and let you know." She thanked him. His next email, with a stated time of 4:30 pm, says, "The 21k was just wired." She responded, "That's awesome. I'll let the kitchen know." Although the timing of this email chain is confusing, the content is inconsistent with the evidence that Mr. White himself had paid the bill in the morning. It also demonstrates what a close call it was that the South Burlington facilities would be able to have food for the next few days.

There is no evidence that any resident at any of the facilities missed a meal on November 6th or 7th or at any previous time.

The Commissioner, having received no response and no assurances that there was not a food crisis at the three facilities, filed this case the next day seeking receivership of the three entities holding the residential care facility licenses as well as the umbrella LLC to the licensees. The *ex parte* motion for a temporary receiver was granted, and Douglas Wolinsky, one of the candidates proposed by the State as required by statute, was appointed.

Mr. Wolinsky went to the facilities the next day with officials from DAIL. He found that Selma, the accounts payable person in South Burlington, was "exasperated" from dealing with unpaid vendors. He found the uncashed rent checks in the drawer at Allenwood. Checks were dated back to March. Because it was unclear what the status of the Reinhart food account was and the effect on the ability to order, he and the State arranged for State funds to make a payment on the Reinhart bill.

Over the next several days, he opened a bank account and deposited the checks that were not stale and used the funds to pay bills. There were bills in arrears at all facilities for items such as trash, food, water, and electricity. The State rooms and meals tax was overdue and unpaid. Residents were extremely anxious on the one hand and relieved on the other that rent checks were being deposited and the Temporary Receiver and his assistants had opened and maintained active lines of communication with them and were responsive to questions.

The hearing in this case started on November 14th, and by stipulation was continued and scheduled for December 10–12.

15

On November 19th, the lender assigned its interest in the mortgage loan to RSS JPMCC2017 JP6-VT EMSO, LLC [hereinafter RSS], an entity authorized to proceed with enforcement based on the Declaration of Default and the Acceleration of the mortgage loan. RSS has entered an appearance in this case as an Interested Party following required notice to the lender pursuant to statute. It was only in late November that the lender's special servicer, Rialto, first learned of this case and the existence of the Temporary Receiver. There is no evidence that anyone in Vermont, including managers, directors, or staff at any of the facilities, or state regulators in the Department, had any knowledge of the lender's or servicer's communications to Mr. White or the Declaration of Default and Acceleration of the loan until after this receivership action had started.

Throughout November, the Temporary Receiver attempted to compile information about residents' financial accounts dating back to February so that updated invoices could be prepared and resident accounts brought up to date, rents collected, and bills paid. The Defendants were not forthcoming with either resident account information or payroll information. Services for both of these functions were provided by non-Defendant East Lake-related LLCs by contract, and they declined to provide the information. Employees for all facilities were actually employed by a non-Defendant entity entitled East Lake Capital Management Employer I LLC, which continued to do payroll and pay employees rather than turn this function over to the Temporary Receiver. The Temporary Receiver filed motions to compel and enforce compliance with the receivership, and on November 29th, filed a motion to hold the defendants in contempt. On November 30th, the State filed a motion to amend the complaint to add additional East Lake LLC entities as Defendants.

Mr. White and the East Lake entities proceeded in November with interviews and the hiring process to hire management for the Vermont facilities in preparation for termination of the receivership, which Defendants opposed. Mr. White made an offer to Stan Slonka, which was accepted by him, for the job of Executive Director of the South Burlington facilities. Mr. Slonka met with the Temporary Receiver. The future of that relationship is on hold due to the uncertainty of the receivership, as Mr. Slonka would need to move his residence. Mr. White hired Sophia Dhaliwal as Regional Director of Operations to be a liaison between corporate in Dallas and facilities located within a specified region, including but not limited to the Vermont licensees. She was not told that the Vermont facilities were under receivership. She began work on December 1st.

She believes that she would be a liaison between corporate headquarters in Dallas and the managers of the Vermont facilities and could provide effective communication that would improve operations, and her background and experience qualify her for that role. The evidence does not support that she would be able to do this, however, because the evidence is clear that all East Lake personnel follow directions only from Mr. White, and his pattern of management is to be nonresponsive to communications and needs from Vermont managers, who have been diligent and persistent in their attempts to contact him with their needs. The pattern is that he simply does not respond. Therefore, there is no reason to believe that Ms. Dhaliwal would be any more effective than Ms. Holm, Mr.

Brumsted, Ms. Provetto, Ms. Moynan, Ms. Cota, Commissioner Hutt, or others in getting response from Mr. White even when food is not available, utilities are threatened with shutoff, there is a shortage of nurses, trash is piling up, there are no budgets, and residents are not getting regular and up to date bills.

On December 10–12, the court evidentiary hearing commenced with the Temporary Receiver's motion for contempt. On December 10th, the Defendants filed a motion to disqualify Mr. Wolinsky as the Temporary Receiver. Both of those motions are currently pending. Additional time was needed for evidence on the motion for receivership, and the continued hearing was scheduled for January 8–15.

In December, residents at all facilities were anxious about not having had invoices for 2018, both for purposes of income taxes and to support claims for long term care insurance. The Temporary Receiver had asked for the information necessary to prepare up-to-date invoices but had not received it from Defendants. The Temporary Receiver's assistant asked Ms. Holm to ask Mr. White for help with invoices. On December 21st, he said he would come to Vermont to provide help on December 26th.

On the same day, the court granted the State's motion to amend the complaint to add additional defendants, and provided that when the hearing continued on January 8th, it would be against all defendants, including the additional ones.[3]

Neither Mr. White nor anyone from corporate came to Vermont on December 26th to help with invoices. Ms. Holm texted Mr. White to see if he was still coming. She received no response of any kind that day.

On December 27th, the Temporary Receiver and original Defendants filed a stipulated motion seeking court approval of agreements made between them. That motion is still pending. Its terms include, among others, a withdrawal by the Temporary Receiver of its motion for contempt and a withdrawal by the Defendants of their motion to disqualify Mr. Wolinsky as Temporary Receiver.

On December 28th, Mr. White informed Ms. Holm that he would fly to Vermont on December 30th to prepare invoices on December 31st. Ms. Holm and others spent Friday–Monday, December 28–31 manually preparing invoices without information or assistance from corporate. They are still not complete or accurately up to date due to missing information. Mr. White did not come to Vermont on December 31st.

The hearing on the merits commenced on January 8th and continued daily until evidence closed on January 18th, with closing arguments heard on January 22nd. When the hearing started the additional defendants specified in the State's motion to amend had

---

[3] Since all hearing time up to that point had been on motions related to the original defendants, and evidence on the merits of the request for a receiver had not begun, there was sufficient time to serve the additional defendants prior to January 8th.

not been served with the Amended Complaint, and the case proceeded only against the original four Defendants.

As of the hearing on the merits, the Temporary Receiver has paid all refunds due to former Homestead residents, paid the Homestead Reinhart bill up to date, and provided $3,100 in petty cash.

Staffing has improved at Allenwood as the Temporary Receiver has used nurses from traveling nurse services to supplement full time staff. It is still not ideal as the employment market in Chittenden County is competitive, and any candidates for longer term positions may be concerned about the future viability and management of the facilities.

As of January 14th, all bills are paid up to date, and the Temporary Receiver has $4 million in the bank. Food deliveries are occurring regularly, and there have been no interruptions in services.

Payroll has continued to be paid from Dallas, although the Temporary Receiver has been willing to take over payroll. Mr. White has still not provided historical records for either rent or payroll, or current payroll records.

At Homestead, Ms. Holm has received shutoff notices but has good communication with the Temporary Receiver and confidence that outstanding bills are immediately paid by the Temporary Receiver to prevent risk of shutoffs.

Plans of Correction for both Allenwood and Manor South have been submitted to DAIL and are apparently acceptable. In order to be in full compliance, billing records need to be up-to-date with monthly bills provided to residents, and residents and their families need to have access to their financial records. The Temporary Receiver has been working on this but has been hampered by noncompliance from Defendants. This applies to all three facilities.

The State claims that lack of billing is a regulatory violation for which it issued repeated deficiencies as described above. Mr. White asserts that it is not a regulatory violation. The State's evidence is that to be in compliance, a licensee must be fully compliant with the Admission Agreement with residents. Mr. White points to the Admission Agreement for Barbara Stearns, which does not require the facility to provide a monthly bill. He is correct, but she is a resident of Harborview, which is an independent living unit. The admission agreements for the licensed facilities require monthly billing.

The Temporary Receiver for some reason had difficulty obtaining information about the mortgage loan and to whom payments should be sent. He attempted to make payments for December and January by writing checks to JP Morgan Chase, which was the original mortgagee but is not the proper payee.

18

The fact that the mortgage loan has been declared in default and the loan accelerated represents a huge threat to the ongoing viability of all three facilities, whether operations are managed by a receiver or returned to the Defendants. Mr. White claims there is a valid defense. Whether there is or not, if the loan goes into foreclosure, which appears imminent unless negotiations are commenced right away, residents would rightfully understand that they are living on shaky ground. They would be living with the risk that they may be required to leave their homes and have to undertake steps to find another place to live. What is seriously concerning is that Mr. White had notice of the lender's position regarding noncompliance with loan requirements since the middle of June—over 7 months ago—and did not respond to many notices and lender/servicer efforts to engage him in communication about the issue.

The foregoing facts include events in the overall chronology showing the pattern of management and regulatory compliance in all three facilities considered together, and the effects on residents. Below is a summary of particular facts related to the individual licensees as of the date of the motion and appointment of a Temporary Receiver on November 7, and as of the conclusion of the merits hearing:

Summary as of November 7, 2019

**Homestead**
- insufficient food supply;
- no food orders had been allowed for one week; stop ship on 11/6;
- staff time chronically needed to get corporate to pay bill so food could be ordered;
- trash overflow for one week at end of October due to nonpayment:
  Ms. Holm took it to dump and paid for disposal herself;
- Ms Holm had extreme difficulty contacting Mr. White in September, October, and November;
- residents still not billed and checks not cashed since February (9 months); and
- refund unpaid for resident who died in February (9 months).

**Allenwood**
- insufficient food supply;
- no food orders had been allowed for one week; stop ship on 11/6;
- no assurance to Commissioner Hutt that Reinhart payment was made that would allow food to be ordered on 11/6;
- severe shortage of nursing staff:
  - open positions; denial of use of traveling nurses;
  - nurses working up to 30 hours of overtime a week or doing double shifts or covering up to 3 positions;
  - medications not timely administered;
  - finding of abuse of resident: unattended for 13 hours 11/3–11/4;
- inability to contact Mr. White or get responses.

19

**Manor South**
- insufficient food supply;
- no food orders had been allowed for one week; stop ship on 11/6;
- no assurance to Commissioner Hutt that Reinhart payment was made that would allow food to be ordered on 11/6;
- petty cash running out; inability to buy food;
- severe shortage of nursing staff:
  - open positions; denial of use of traveling nurses.

With respect to the security and safety of residential care residents in all facilities, their daily life status as of November 7th was one of actual instability and a mental state of extreme anxiety over the actual lack of stability.

Their actual safety was seriously compromised by the fact that the risk was very high that their facility was not likely to be able to provide them with proper meals over the next several days. This applied at all facilities.

In addition, the nursing shortage at Allenwood and Manor South (not Homestead) meant that for many there was lack of ability to meet their needs as described in their care plans. For example, if they needed medications (including anti-seizure and anti-stroke medications), it may not be given on the prescribed schedule, thereby putting them at risk. If there was more than one emergency on the large Allenwood–Manor South campus, there likely would not be the kind of immediate response that the emergency called for. If they were unsteady at walking and needed monitoring for potential falls, such monitoring may not happen. Nurses attending residents may be exhausted from overwork and not able to function effectively.

These represented the imminent risks of serious physical harm, including risk of death.

In addition, at all facilities the residents were actually experiencing serious mental harm. They no longer lived in a safe, protective, reliable home where they could trust that they would be properly cared for. The anxiety level was extremely high. Those with awareness knew that for nine months, their checks had not been cashed, leaving them to wonder how the facility could survive if it was not taking in income, and complicating their own ability to know how much money was in their own personal accounts and how much more they owed. They had to wonder, and as a result experienced stress, over how the bills at the facility were being paid, and when the money would run out since none was apparently being taken in. Thus, they had to worry about losing their home and having to find another place to live. Back in June, they had been promised communication and a resolution of the billing issue, but neither had happened in nearly five months. They had seen a well-run facility crumble around them.

At Allenwood and Manor South, familiar nurses and staff were gone and not replaced; the van to take them to medical appointments could not be used and needed

20

repair it was not getting; they could see that remaining staff was overworked and anxious; the posted menus were not reliable as food choices were reduced and changed from what was posted; and the facilities had been struggling without a proper Executive Director for months. Food service had gone from served meals to self-service at buffet tables creating a challenge for those with infirmities to struggle on their own to get to a table with appropriate food on their plates. Trash piled up outside.

At Homestead, residents were anxious and angry about the lack of billing and checks being cashed and yelled at staff. While Homestead did not have the same nursing and staff shortages as the other facilities, the stress on residents of worrying about money and having a place to live where they were well cared for was the same. The hairdresser, whose weekly appointments had provided many with routine physical and social support, left. Trash was not picked up.

While it is true that no resident missed a meal at any facility and the State had concluded in mid-October that at Homestead and Allenwood, despite deficiencies, the residents were not in immediate jeopardy, one cannot ignore the serious mental harm resulting from experiencing the transformation of a safe, secure home to a place of risk, anxiety, and tension, and that pattern only increased between October and November 7th. When a ship takes in a little water through a small leak, there may be some anxiety for the passengers, but it can be tolerable as long as it is temporary and those in charge solve the problem. However, if that leak is not repaired and over a period of time there are many other leaks such that the ship begins to be riddled with leaks and the situation is escalating and beginning to look like a sinking ship, mild anxiety may gradually become a legitimate overwhelming fear of disaster.

The residents of these residential care facilities, by definition, are vulnerable, often elderly, people needing daily care and support and perhaps medical attention in order to maintain daily life. They do not have the resiliency to escape the situation that they counted on relying on for the rest of their lives. As of November 7th, there was not just a danger of serious mental stress, but widespread mental stress at all facilities as demonstrated by the fact that by November 7th, the State had been receiving an increasing flow of anxious complaints from residents and their families over the previous several weeks.

Summary as of January 18, 2019

Since the appointment of the Temporary Receiver, many situations have been stabilized, at least temporarily. Checks have been cashed and rental income has been deposited in a bank account, from which bills are being paid in a timely manner. Food bills are paid so the food shortage problem has been resolved as well as the problem of ongoing and regular anxiety on the part of staff as to whether they will be able to order and pay for food. Sufficient petty cash is on hand for incidental needs. Residents are benefiting from regular, direct communication with and information from the Temporary Receiver and his assistants, both on-site and by telephone and electronic means. Staff does not need to spend time trying to communicate with corporate on an emergency basis

to get bills paid or seek solutions for regulatory compliance issues. Resident refund payments are up to date.

Nursing shortages have been somewhat relieved at Allenwood and Manor South by the use of per diem nurses from agencies and traveling nurse services, although long-term positions cannot be filled easily due to the uncertainty of the future of the receivership and the viability of the facilities as well as the tight employment market in Chittenden County.

While current invoices have been sent out for December and January, the problem of up-to-date resident accounts persists. The Temporary Receiver has not been able to get accurate historical records from Defendants to be confident of the accuracy of resident accounts and has been unable to put in place systems for future monthly billing and availability of accurate financial records. This is due to the refusal of Defendants to make such information available. As a result, the ban on admissions at Allenwood, the largest facility, remains in effect, and the reduction in future income is a potential source of lack of financial health going forward.

Defendants seek the dissolution of the receivership and to be able to resume operations of the facilities. The evidence is extremely clear that if the receivership were not in place, the patterns of operation and problems that existed previously would return. The inability of local staff, including local managers, to get corporate to provide timely vendor payment, assistance with regulatory matters, money for incidentals, and information necessary to run the facility would resume. Bills, including utility bills, would not be paid on time. Mr. White testified that he was unconcerned about utility shutoff notices because he was confident that utilities would not shut off services to residential care facilities. His testimony was also that bills that show 'past due' balances on their face were not actually past due. Thus, it is almost certain that staff would be caught in the middle again between disgruntled vendors and corporate stonewalling of vendor payments. There is no reason to think that accurate billing would begin, as Defendants have done nothing to remedy that situation for over 10 months, despite pressure from regulators and a two-month receivership.

Mr. White, despite the existence of multiple LLCs, is clearly the individual decision-maker in charge of all the decisions pertaining to the three facilities. He does not believe that there was a food shortage and highlights the fact that the Reinhart bill was paid on November 6th and no resident went without food. He does not believe that there was a nursing shortage as he relies on algorithms of what constitutes a sufficient nursing staff and he believes that there were sufficient nurses during the period when the regulators and the Court have found serious shortages in nursing staff. Mr. White's testimony about every single deficiency claimed by the State was that the State was wrong and there were no grounds for any deficiency. In short, there is no reason to believe that his patterns of management would be any different if operations were returned to the Defendants.

There is now another circumstance that must be faced in relation to the future safety and security of the residents. That is the fact that the mortgage holder considers the mortgage loan to be in default and has sent notice of acceleration of the loan with over $24 million claimed as currently due and payable. The claim of noncompliance with mortgage agreements on the part of the mortgage holder was first made to Mr. White back in June, and he has received several communications about it over time and been offered opportunities to communicate, to which he has not responded. At the hearing, he testified that it was not a problem because he considers that the loan was not in default based on his own interpretation of the documents, and he refuses to communicate with Rialto, the special servicer, because he believes the delegation of authority to Rialto was without proper grounds.

Whatever the ultimate disposition is of the mortgage holder's claim, the fact remains that the claim of default and acceleration of a $24 million debt is a serious one that has been made through a series of communications over time with invitations to communicate, and Mr. White has ignored it. He conducts the Defendants' business as if the claim does not exist. Failing to deal with this situation in a responsible manner creates extreme instability for the future of the facilities and a situation in which the residents are quite justified in concluding that they may lose their home and have to look for an alternative to the home where they had placed themselves to be safe until the end of their days. Mr. White testified that even if the worst thing happened and the property were foreclosed, he would just buy it anyway. However, such a strategy fails to account for the fragility created as to continued viability of the facilities themselves or as licensed facilities, or the extreme mental stress such a situation causes for the residents and their families.

If a receiver is not appointed, there is no basis for confidence that the Defendants will address the mortgage holder's claim in a prompt, serious, and responsible way that allays legitimate resident worries about the future of the facilities.

A disagreement has developed between the Temporary Receiver and RSS as to how resident rent checks need to be processed and funds made available for the payment of bills. The court will address this issue in the context of motions and other procedures as set forth at the conclusion of this decision.

## Conclusions of Law

The request for a receiver is brought pursuant to 33 V.S.A., Part 5, entitled "Programs and Services for Vulnerable Adults," Chapter 71, entitled "Regulation of Long-Term Care Facilities," Subchapter 4, entitled "Receivership Proceedings."

The statute does not specify any special burden of proof for purposes of the evidentiary hearing and Vermont law otherwise is inconclusive. According to some authorities, the extraordinary nature of the appointment of a receiver counsels in favor of the clear and convincing evidentiary standard. See 65 Am.Jur.2d Receivers § 67 and

23

cases cited therein. Thus, while it is unclear under Vermont law whether the normal civil preponderance of the evidence standard or the more scrutinizing clear and convincing evidence standard is required, the Court has reached these conclusions of law based on having found the foregoing facts and the standards met by clear and convincing evidence.

The court has considered both whether the evidence as of November 7th was sufficient to prove the elements required for appointment of a temporary receiver on an *ex parte* basis,[4] and whether the evidence as of the close of the hearing on January 18th was sufficient to prove the elements required for ongoing appointment of a receiver. The court concludes that the elements of the State's claims as of both dates have been proved by clear and convincing evidence.

November 7, 2018 appointment of Temporary Receiver on an *ex parte* basis.

The pertinent provisions of 33 V.S.A. § 7203, entitled "Appointment of temporary receiver," provide for the Court to appoint a temporary receiver *ex parte*:

> (b) . . . . when the Court finds that there is a reasonable likelihood that:
>
> .  .  .
>
> (1)(B) a situation, a physical condition, or a practice, method, or operation presents imminent danger of death or serious physical or mental harm to residents; and
>
> (2) the situation must be remedied immediately to ensure the health, safety, and welfare of the residents of the facility.

33 V.S.A. § 7203(b).

As the facts demonstrate by clear and convincing evidence, on November 7th at all facilities, there was a reasonable likelihood of a food shortage that would cause the residents of those facilities to not be able to be supplied with meals to meet their nutritional needs over the next several days. Although there is evidence that money was wired to Reinhart on November 6th, the food shortages were dire, the weekend was coming up, there had been a pattern of regular "stop ship" orders from Reinhart preventing orders, and an inability to order food for nearly the entire previous week. This applied to all facilities.

It is clear and convincing that at Allenwood and Manor South, there was a reasonable likelihood that the nursing staff shortage would cause the residents of those facilities to lack the nursing care they needed both for ongoing maintenance of their care

---

[4] Defendants asked the court to review whether the facts set forth in documents filed on November 7th (as opposed to the facts in existence on that day) were sufficient to meet the necessary standard for an *ex parte* appointment of a receiver. The court already made such a ruling by its decision of that date granting the motion. Defendants have provided no legal basis for the court to do a second analysis on such a ruling.

24

plans, including timely medication administration and necessary monitoring, and for the ability to respond in a timely way to emergencies that could occur at any time among multiple vulnerable residents across two buildings.

The evidence is clear and convincing that due to the pattern of failure to cash rent checks and bill residents as well as the failure to pay bills in a timely manner to avoid the risk of shutoffs of utilities and other necessities, and the escalating reduction of services and staff over a period of months, the Defendants had put the residents under severe mental stress and harm, resulting in legitimate fears that the Defendants would not be able to care for them and they would need to find another place to live.

As a result of these situations and conditions, the first element has been proved.

It has also been proved that the situation of the food shortage had to be remedied immediately so that the residents could be provided with three nutritious meals each day. There was no money for food from any source other than corporate headquarters in Dallas, and there was no information that money was coming from that source. As of November 7th, the State had received no information from Dallas and had no confidence that the food shortage would be averted. It needed to provide an immediate remedy.

The facts support by clear and convincing evidence the reasonable likelihood that the two required circumstances were in place requiring the appointment of a temporary receiver on an *ex parte* basis.

Appointment of Receiver based on conditions as of January 18, 2019.

The pertinent provisions of 33 V.S.A. § 7202, entitled "Application for receiver," provide for the Court to appoint a receiver on the following grounds:

> (2) a situation, a physical condition, or a practice, method, or operation which presents imminent danger of death or serious physical or mental harm to residents exists in a facility . . .;

> (3) a facility is in substantial or habitual violation of the standards of health, safety, or resident care established under State or federal regulations to the detriment of the welfare of the residents . . .; [or]

> (4) the facility is insolvent[.]

33 V.S.A. § 7202(a).

*(a)(2) Imminent danger of serious physical or mental harm to residents.*

As to the grounds set forth in (a)(2), the findings of fact show by clear and convincing evidence that without a receiver in place, the situation at each of the facilities would be as it was on November 7th: food shortages, serious mental harm to the residents from the escalating effects of remote and unresponsive management and resulting

25

compromise of services to residents, and nursing shortages at Allenwood and Manor South. The situation is profoundly exacerbated now with the information that the mortgage holder had notified the Defendants of default and a need to cure over 6 months ago and has declared the mortgage loan in default and accelerated it, and the Defendants have done nothing to address the issue. This highlights the fact that the methods of corporate management continue to be responsible for creating situations that only add to the mental stress of residents and the real risk that they will no longer have a home. The State has proved the grounds under (a)(2) by clear and convincing evidence.

*(a)(3) Habitual violation of State regulations for health, safety, or resident care.*

As to the grounds set forth in (a)(3), the facts show, by clear and convincing evidence, repeated, "habitual" violation of State regulations over a sustained period of time after many opportunities to come into compliance. Specifically, it is a violation of resident care regulations not to be in full compliance with resident Admission Agreements, and the Admission Agreements for all three licensees require the Defendants to bill residents monthly. This violation has been cited repeatedly as a deficiency and a repeat deficiency in several surveys, and the ban on admissions at Allenwood remains in effect because it has not been cured. There has been nearly a year to come into compliance, and not only did Defendants fail to come into compliance prior to November 7th, they have frustrated the Temporary Receiver's attempts to pursue compliance over the last two months.

At all facilities, there has been habitual noncompliance with the requirement to have sufficient food reserves available to provide the residents with meals that meet their nutritional requirements. This is as a result of the habitual late payment of food bills and the resulting shortage of food to meet menus and maintain adequate emergency food reserves.

There was repeated noncompliance with the regulation to return refunds to residents who left the facilities within 15 days, and this was a continuing violation over an extended period of time.

The State has proved the grounds under (a)(3) by clear and convincing evidence.

*(a)(4) Insolvency.*

The statute does not define insolvency. Black's Law Dictionary generally defines insolvency as the "condition of being unable to pay debts as they fall due or in the usual course of business" and further distinguishes among balance-sheet insolvency, equity insolvency, and notorious, or public, insolvency. Black's Law Dictionary, insolvency (10th ed. 2014). Receiverships typically are imposed for the protection of creditors or other claimants to ensure that assets will remain available to satisfy legitimate claims. The economic solvency of the entity placed under receivership in such cases is of paramount concern.

The economic solvency of the facilities at issue in this case is no less important but preservation of assets to satisfy a claim is not the focus. As 33 V.S.A. § 7201 plainly states, "The purpose of [these proceedings] is to provide for the receivership of a long-term care facility in order to ensure safe surroundings, adequate care, and humane treatment; to safeguard the health of, safety of, and continuity of care to residents; and to protect residents from the adverse health effects caused by abrupt or unsuitable transfer of such persons cared for in these facilities." The issue is the welfare of the residents.

The trial was not geared toward a showing that any of the facilities is insolvent in the sense that any currently lacks the revenues to enable the payment of ordinary debts when due.[5] However, the trial was replete with evidence, and the findings make clear, that all three facilities for a protracted period of time have been managed in a highly dysfunctional manner including, at a minimum, purposely not seeking or collecting payment for rent, purposely not accepting rent that was paid anyway, not paying basic bills in a timely fashion to avoid interruptions to necessary services and food or other items, and then impeding the Temporary Receiver's efforts at stabilizing the operations of the facilities.

Mr. White testified that some East Lake Capital Management entity provided funds to pay bills in exchange for the value represented by the uncashed checks, but there was no documentary evidence of that as a recognized transaction of the Defendant entities. On the contrary, the clear and convincing evidence was that until the Temporary Receiver cashed the checks in the drawer, there had been no income taken in by any of the three facilities for a period of 9 months, and during that period, numerous bills from numerous vendors and others, including the Vermont Department of Taxes, were unpaid or paid late.

For purposes of proof of insolvency under 33 V.S.A. § 7202(a)(4), the Court adopts the Black's Law Dictionary of the "condition of being unable to pay debts as they fall due or in the usual course of business," and further interprets "unable" in the context of licensed residential care facilities under Title 33 to mean 'unable' for any reason whatsoever (not just not having access to sufficient money to cover bills). In this case, the evidence is clear and convincing that the Defendant entities were unable to pay based on patterns of mismanagement of resources due to either deliberate decision making or the effect of poor operation. They were chronically unable to meet the ongoing daily expenses, in the usual course of business, for food and products and services needed to meet the needs of residential care facilities for their health, safety, and daily care. The effect on residents is the same whether there is a lack of sufficient revenues to pay debts (insolvency in fact) or whether sufficient revenues are available but not used appropriately due to managerial decisions (insolvency in effect).

The State has proved the grounds under (a)(4) by clear and convincing evidence.

---

[5] The lender's acceleration of the debt certainly could have a deleterious impact on the facilities' solvency but it is unnecessary to address that matter at this time.

27

Summary of Conclusions of Law

The State has proved, by clear and convincing evidence, three separate grounds for the establishment of receiverships pursuant to 33 V.S.A. § 7202 as to each of

> ELCM Homestead Management LLC,
> ELCM Allenwood Management LLC, and
> ELCM Manor South Management LLC.

ELCM Pillsbury Management LLC has an ownership or controlling interest in each of the above LLCs as well as an operating agreement with them. All findings of fact and conclusions of law arise out of the operations of the above entities and are therefore attributable to ELCM Pillsbury Management LLC as well. Thus, the State has proved by clear and convincing evidence the grounds for a receivership over ELCM Pillsbury Management LLC.

**Pending Motions**

*Motion to Proceed under Amended Complaint, MPR 14*

The State seeks a ruling that the additional Defendants added in the Amended Complaint be adjudged subject to the ruling resulting from the hearing that concluded on January 22, 2019. The motion is denied. As Defendants' counsel argued, they were not served with the Amended Complaint once the Motion to Amend was granted, which was on December 21, 2018. It is true that the court's entry order stated that when "the hearing continues on January 8, 2019, it will be against all Defendants, including the additional ones added by this amendment."

At that time, there was sufficient time to serve them prior to the scheduled hearing date of January 8th, as 33 V.S.A. § 7204 provides that a hearing shall be held within 10 days of filing the complaint, and not less than five days before the hearing. They were not served prior to January 8th, however. As they had not been served with the authorized Amended Complaint and a notice of hearing that gave them at least five days notice, they were not subject to the authority of the court. The State's argument that they had notice of the original action is unavailing, as in that complaint, there was no request that the additional entities be placed in receivership.

Returns of service have now been filed, indicating service on or around January 9–11, 2019. If Plaintiff wishes to pursue receivership against any additional entity served with the Amended Complaint, it may request a hearing date and serve the notice of hearing on the entity. If no request for hearing is filed by February 15, the claims against the additional Defendants will be dismissed.

28

*Motion to Disqualify Temporary Receiver Mr. Wolinsky and the Primmer firm, MPR 9*

This motion was filed December 10th, but it has not been acted upon. On December 27th, the Temporary Receiver and Defendants filed a Stipulated Motion to Approve Stipulated Order and Letter Agreement. In that motion, which has also not been ruled upon and which has been opposed by RSS, the Defendants and the Temporary Receiver seek approval for their agreement to a number of terms, including that the Defendants would withdraw their Motion to Disqualify and the Temporary Receiver would withdraw his Motion for Contempt.

The Court will not approve withdrawal of the Motion to Disqualify as a quid pro quo for other terms of agreement. The appointment of a receiver constitutes an appointment by the Court of a person to act on behalf of the Court itself. The Court must independently determine whether a person is qualified to perform receivership duties. 33 V.S.A. § 7206(a). Once facts have been presented calling into question whether a person should be disqualified for appointment as a receiver, it is not a matter that can be resolved solely by waiver of a party. The issue relates to the integrity of the Court. The Court needs to consider the issue and make its own independent judgment.

In the motion, it is alleged that Mr. Wolinsky's law firm was the attorney for East Lake Capital Management from February of 2016 to January of 2018, ending just before the events that led to this action. East Lake Capital Management has been identified by Mr. White as the parent company related to Defendant LLCs and the provider of funds to pay Defendants' bills. Mr. White, who testified that he is 90% owner of East Lake Capital Management, signed the engagement letter with the Primmer firm on behalf of East Lake Capital Management. The scope of the representation described in the engagement letter is "licensing and other regulations and approvals related to the potential acquisition of assisted living facilities owned by the Larkin Hospitality Group."

Evidence at the hearing was that the license applications for the three licensees in this case were prepared by Attorney Shireen Hart, an attorney in the Primmer firm who has appeared in this case as the attorney for the Temporary Receiver.

The complex corporate ownership and management structure of which Defendants are a part is likely to present issues to be addressed by the receiver in this case going forward. It appears that Mr. Wolinsky and his law firm represented the Defendants during the formation of this structure. This raises serious questions about which the court needs more information.

No party has responded to the Motion to Disqualify, perhaps due to the fact that the pending Stipulated Motion to Approve Stipulated Order and Letter Agreement was put on hold during the hearing on the merits of receivership.

At this time, since there will be ongoing receiverships, the Motion needs to be addressed. Therefore, the Court will schedule a hearing on this motion. Parties may, but are not required to, submit responses to the motion in writing prior to the scheduled

29

hearing, but the hearing will be scheduled on short notice due to the need to resolve as soon as possible who will be the receiver going forward.

*Other Motions*

Also pending are the Temporary Receiver's Motion for Contempt (MPR 7) and the Stipulated Motion to Approve Stipulated Order and Letter Agreement (MPR 10).

Because the outcome of the Motion to Disqualify could affect the status of both of these motions, they will remain pending until the Motion to Disqualify is resolved.

**ORDER**

Based on the foregoing,

The Court will appoint a receiver for all four original Defendant entities.

The Temporary Receiver Douglas Wolinsky shall continue to serve as Temporary Receiver pending the outcome of the Motion to Disqualify.

The Commissioner updated the list of recommended receivers submitted pursuant to 33 V.S.A. § 7205 on January 14, 2019, and is invited to submit a further revised list if there are any changes.

The Clerk shall schedule a hearing on the Motion to Disqualify as soon as possible.

Date at Montpelier, Vermont this 25th day of January 2019.

_____
Mary Miles Teachout
Presiding Judge

30